## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| ANGELA ALLEN, an individual; DEVIN CUNNINGHAM, an individual; NALICIA MOHAMED, an individual; and RELIABLE PLATINUM BUILDINGS, LLC, a Florida limited liability company, | CASE NO: |
| *Plaintiffs,* | |
| v. | |
| BIG BUILDINGS DIRECT, LLC, a Florida limited liability company; and ANTHONY PANAPINTO, an individual, | |
| *Defendants.* | |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – DECLARATORY RELIEF REQUESTED

Plaintiffs Angela Allen, Devin Cunningham, Nalicia Mohamed, and Reliable

Platinum Buildings, LLC, through undersigned counsel, file this Complaint against

Big Buildings Direct, LLC, and Anthony Panapinto and state:[1]

---

[1] Plaintiff Angela Allen ("Allen"), Plaintiff Devin Cunningham ("Cunningham"), Plaintiff Nalicia Mohamed ("Mohamed") and Plaintiff Reliable Platinum Buildings, LLC ("Platinum") are collectively "Plaintiffs." Defendant Big Buildings Direct, LLC ("BBD") and Defendant Anthony Panapinto ("Panapinto") are collectively "Defendants."

## INTRODUCTION

1.     Allen and Cunningham are a couple who were formerly employed by BBD, a metal building broker owned by Panapinto. After quitting BBD, Cunningham and Mohamed created Platinum, a metal building broker competitive with BBD.

2.     Defendants launched a smear campaign with designs on ruining Plaintiffs' reputations. Among other things, Panapinto, individually and on behalf of BBD:

    a. repeatedly called Allen's new employer and claimed that she had committed credit card fraud totaling at least $100,000, that she was under FBI investigation, and that at least 18 of BBD's "customers" had also "filed charges";

    b. posted multiple photos Facebook of Allen and Cunningham with captions stating that they had robbed BBD's offices and committed fraud;

    c. told numerous Platinum customers that they should cancel their orders because Plaintiffs were engaged in fraud and being investigated by "the FBI"; and

    d. told numerous metal building manufacturers that Plaintiffs were engaged in fraud and should not be worked with.

3.     None of these things were true.

4.     Defendants also began harassing Plaintiffs through Platinum's customer lead service. Among other things, Panapinto, individually and on behalf of BBD, sent emails calling Cunningham a "Fuckin Niiggar", claimed that Allen had "faked" a cancer diagnosis, and threatened Mohamed with gang rape.

5. Unfortunately, Defendants' conduct has been rewarded. Plaintiffs' reputations have been tarnished. Allen was forced to leave her new employer. Platinum is on the verge of collapse because numerous customers cancelled their contracts with it while prospective customers and manufacturers refuse to do business with it.

6. To add insult to injury: Defendants never even paid Allen overtime wages owed to her. BBD nonetheless maintains that Allen is bound by a Non-Compete—despite the utter lack of legitimate business interests supporting such a position.

7. This is an action for false and misleading advertising under the Lanham Act, violations of the FLSA, defamation *per se*, tortious interference with Allen and Platinum's relationships, and a declaratory judgment that Allen's post-employment restrictions are unenforceable as written.

8. Plaintiffs seek damages stemming from Defendants' misconduct to the fullest extent permitted by law and an order requiring Defendants to engage in corrective advertising in the form of appropriate disclosures to their former, current, and prospective clients and vendors that they have lied about Plaintiffs.

## PARTIES

9. Plaintiff Allen is a Florida citizen residing in Hillsborough County.

10. Plaintiff Cunningham is a Florida citizen residing in Hillsborough County.

11.     Plaintiff Mohamed is a Florida citizen residing in Polk County.

12.     Plaintiff Platinum is a Florida limited liability company with its principal place of business in Polk County, Florida. Platinum is co-owned by Cunningham and Mohamed.

13.     Defendant BBD is a Florida limited liability company with a principal address located at 1515 N. Marion St., Tampa Florida, 33602.

14.     Defendant Panapinto is a citizen of Florida residing in Hillsborough County. At all times material, Panapinto has been the owner and principal of BBD. As BBD's owner, Panapinto had, at all times material, operational control over significant aspects of BBD's day-to-day functions, including the compensation, scheduling, and supervision of employees. Panapinto is an employer within the meaning of 29 U.S.C. § 203(d) and is personally liable for the FLSA violations complained of herein.

15.     At all times material, BBD and Panapinto maintained control, oversight, and direction over Allen in her capacity as an employee of BBD, including, but not limited to, hiring and firing decisions, determining the rate of pay and work schedules, maintaining employment records, and otherwise controlling the terms and conditions of Allen's employment.

16.     At all times material, BBD was an "enterprise engaged in commerce" within the meaning of 29 U.S.C. § 203. Allen's work for Defendants affected interstate commerce for the relevant time period because she constantly and continually worked with prospective and actual purchasers and manufacturers located across the United

4

States. The metal buildings requested, designed, and ordered moved through interstate commerce during and subsequent to Allen's work. BBD grossed in excess of $500,000 per annum for the relevant time period.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for Plaintiffs' claims arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as for Allen's claim arising under the Fair Labor Standards Act ("FLSA"), 29 USC § 203.

18.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for claims so related to Plaintiffs' Lanham Act claims that they form part of the same case or controversy.

19.     This Court has personal jurisdiction over BBD because it is a Florida limited liability company with its principal place of business in Hillsborough County, Florida, and continuously conducts business in Hillsborough County, Florida.

20.     This Court has personal jurisdiction over Panapinto because he is a Florida citizen residing in Hillsborough County, Florida.

21.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because Defendants are subject to personal jurisdiction in this District and because the acts giving rise to the claims herein occurred in this District.

## GENERAL ALLEGATIONS

### A. The Metal Building Broker Industry

22.     BBD and Platinum broker the sale of residential and commercial metal buildings throughout the United States. Brokers charge a fee for acting as intermediaries between metal building purchasers and manufacturers.

23.     Brokers work with prospective customers (individuals and entities seeking commercial and residential metal buildings) to facilitate the purchase of metal buildings. Brokers coordinate the pricing, creation, and delivery of the desired buildings with various manufacturers across the country.

24.     Often, prospective purchasers reach out to multiple metal building brokers—or directly to manufacturers—during their search for a metal building.

25.     There is very little repeat business from purchasers.  It is only so often that one needs a metal building or garage. At the same time, satisfied customers' word of mouth can be a beneficial means of gaining new business for metal building brokers.

26.     Manufacturers typically do not have dedicated sales teams or employ individuals with customer service backgrounds. Brokers help manufacturers by identifying prospective clients and coordinating the purchase of metal buildings.

27.     Manufacturers rarely, if ever, have exclusive agreements with brokers. Instead, they work with any number of metal building brokers to facilitate the fabrication and delivery of buildings to buyers across the United States.

28.     Manufacturers do not typically offer standing price discounts to specific metal broker entities, but a broker who has successfully done business with a given manufacturer may be able to receive slight discounts for a particular building.

**B. BBD's Business Model**

29.     BBD generates leads for prospective clients by purchasing them or by responding to inquiries received through its website or by phone.

30.     Many metal building brokers have 3D design platforms on their websites, available to anyone with an internet connection. These design platforms allow prospective customers to provide a series of desired specifications to generate 3D renderings of metal buildings.

31.     BBD does not offer such a service. Instead, BBD's salespeople simply access the websites of competitors who *do* offer such services and plug in the specifications requested by a prospective client over the phone or email. They then download the renderings generated by their competitors' website and provide it to a prospective client.

**C. Allen and Cunningham's BBD Tenure**

32.     Cunningham joined BBD as a salesperson in April 2020. He was not required to sign any restrictive covenants.

33.     Cunningham immediately excelled. He became one of BBD's top producers. He worked with numerous prospective and actual purchasers and manufacturers across the country.

34.     Several months after BBD hired Cunningham, Allen joined as well. Unlike Cunningham, she signed an employment agreement. *See* Employment Agreement ("Agreement") attached hereto as Exhibit "A."

35.     Allen was originally hired as "flipper." This means that she would handle intake calls of prospective purchasers and pass them to BBD's salespeople. As time went on, Allen transitioned to a salesperson given her sales experience. Like Cunningham, she excelled.

36.     During her tenure, Allen routinely worked more than 40 hours per week. She was never paid overtime during her BBD tenure.

**D. Panapinto Poisons the Workplace**

37.     BBD's work environment was not a professional one.

38.     Panapinto continually made comments that ranged from gross to offensive.

39.     For example, he often made suggestive—and at times outright explicit—sexual comments in the office, often about his penis.

40.     Panapinto would frequently talk fondly about his "racist friends back home."

41.     In another instance, Panapinto mockingly asked Cunningham, "how much chicken" he had eaten for lunch.  This was plainly playing on long-standing and offensive racial stereotypes levied at Black Americans.

42.     Panapinto seemed particularly fixated on the fact that Cunningham and Allen were in an interracial relationship. He brought it up often.

43. But it was not just racism and sexual comments that made the environment tough for Allen and Cunningham: Allen was singled out. She was sequestered from the salesfloor and required to sit in an office adjacent to Panapinto with her door open so that he could watch her throughout the day.

44. While working as a flipper, she was falsely accused by Panapinto and others at BBD of providing Cunningham with preferred leads when prospective customers called in.

45. While working as a salesperson, she was criticized for following the same protocols as all other BBD salespeople.

46. Eventually, enough was enough. Cunningham and Allen quit in the fall of 2020.

**E. Cunningham and Mohamed Form Platinum**

47. After leaving BBD, Cunningham and Mohamed formed Platinum, a metal building broker directly competitive with BBD.

48. Mohamed never worked for BBD.

49. Cunningham and Mohamed did not rely on any of BBD's information to start Platinum. Instead, Cunningham tapped into his own skills, gained from years of sales and recruiting, as well as the wealth of publicly available information regarding metal building manufacturers and prospective purchasers.

### F. Defendants' Campaign of Smears, Slurs, and False Advertising

50.     Panapinto was incensed that Allen and Cunningham had quit and that Platinum was engaged in fair competition. Defendants set out to destroy Plaintiffs' abilities to compete with it.

#### i. *Defendants' False Facebook Advertising*

51.     Panapinto, individually and on behalf of BBD, took to Platinum's Facebook page. He posted pictures of the couple and stated that they were under investigation for "burglary, check fraud, business fraud" in Tampa and asked that individuals—presumably manufacturers and prospective clients looking at Platinum's page—to notify police if they had any "evidence" and stated that he was "giving out rewards to anyone that has information that lead[s] to their arrests." *See* Facebook Posts, attached hereto as Composite Exhibit "B".

52.     In a separate post also containing Allen and Cunningham's photographs, Panapinto, individually and on behalf of BBD, stated that BBD had "been robbed" by "two employees" including "Angela Allen of Kissimmee, Florida working as a manager of Hilton Resorts. Check fraud in the amount of $16,344.77 as well as credit card fraud . . . She is with her boyfriend Devin Cunningham during the theft as shown." *Id*. In reality, the photos were taken from surveillance footage outside of BBD's facility as the two walked in to work while still employed by BBD.

53.     That post also tagged Mohamed's Facebook account and stated that she was engaged in "business fraud."

54.     The post again asked for "any information in regards to further other thefts committed" and stated that "local and federal authorities" were investigating the trio.

55.     Defendants' statements were made to, among others, actual and prospective market actors in the metal building broker industry. They were made solely to unfairly inhibit Plaintiffs' fair market competition.

56.     Defendants' statements also reached a number of Plaintiffs' friends and colleagues.

            ii. *Defendants' False Advertising to Platinum's Customers and Manufacturers*

57.     But Defendants did not stop there. They began systematically reaching out to manufacturers and customers who had agreed to do business with Platinum.

58.     Defendants falsely asserted directly to these individuals and entities that Plaintiffs were engaged in a litany of misconduct, including that:

    a.  Plaintiffs were engaged in fraud;

    b.  Cunningham and Allen, individually and on behalf of Platinum were defrauding customers;

    c.  Purchasers should call their credit card companies and cancel transactions with Platinum—and that BBD would discount the costs of any buildings they had agreed to; and

    d.  the FBI was investigating Plaintiffs.

*See, e.g.*, Purchaser Email, attached hereto as Exhibit "C".

59.     At a minimum, Defendants made such statements to purchasers named Hajek, Marteny, and Schwartz. BBD claimed to at least one customer, Hajek, that at least six other customers of Platinum had been defrauded by Plaintiffs. *Id*.

60.     As a direct result of Defendants' conduct, numerous purchasers not only cancelled their deals with Platinum, but demanded that their accounts be credited for money that they had already paid.

61.     Credit institutions also began treating Plaintiffs with suspicion as at least some purchasers called their credit institutions to report the "fraud" that Defendants claimed had been perpetrated.

62.     Defendants also reached out to numerous manufacturers directly and falsely advertised that Plaintiffs were engaged in fraudulent contact. At a minimum, Defendants made such statements to Infinity Steel Buildings Inc. ("Infinity"), New Team Carport, LLC ("New Team"), Universal Metal Buildings ("UMB"), and Quality.

63.     As a direct result of Defendants' conduct, numerous manufacturers immediately ceased doing business with Plaintiffs and have indicated a reluctance to engage in business moving forward.

### iii. *Defendants' Harassment Through Platinum's Client Intake Service*

64.     Panapinto, individually and on behalf of BBD, is also believed to be behind a number of offensive and harassing emails sent to Platinum's lead intake service using false email addresses.

12

65. For example, Platinum received the following 'leads':

   a. Name: "Sucka"; Last Name: "Mycock", from email address "Devinisaniggar@gmail.com";[2]

   b. Subject: "Fuckin Niiggar" from email "pussyslut@yomama.com" with a 'contact number' of "(911) 911-9191";

   c. Name: "Tonya Allen" from email address "Ireallyfakedhavingcancer@yahoo.com";

   d. First Name: Nalicia, Last Name: "Isahoe", from an email address "Cantwaittorunatrainonyoiras@ymail.com";

   e. Subject: "FuckyouallYoupussyassbitches" from an email address of "Ihopeyourotinjailfraudbitches@gmail.com"; and

   f. First Name: "Scamhaha", Last Name: "Ifeelbadforyou" from email address "poorcriminals@yahoo.com";

See False Leads, attached hereto as Composite Exhibit "D".

66. Around the same time, an unknown number believed to be Panapinto texted Allen the following:

> Don't know what's gonna get you first. The "cancer" you claim to have or the massive amount of prison time you're fixing to serve.

See Text Message, attached hereto as Exhibit "E." Allen was readying for chemotherapy at that time.

   iv. *Defendants' Calls to Allen's New Employer*

67. Upon leaving BBD, Allen joined a Medicare billing company in St. Petersburg, Florida.

---

[2] This particular 'lead' is believed to have been sent on Christmas day.

68.     Panapinto, individually and on behalf of BBD, called this employer at least twice. Each time, he falsely stated to this employer that Allen had committed credit card fraud. He claimed that Allen's alleged fraud exceeded $100,000 and that he had more than 15 customers who were defrauded by her. He claimed that she was being investigated and insinuated that she should be terminated from the employer due to her untrustworthiness.

69.     These calls caused Allen's relationship with her employer to diminish significantly. Due to Defendants' conduct, Allen is no longer is employed there.

**G. Allen's Non-Compete is Unenforceable as Written**

70.     Allen's employment agreement with BBD contained a non-competition provision. *See* Ex. A at § 8 ("Non-Compete"). The Non-Compete does not protect any of BBD's legitimate business interests. It serves only to restrain trade by cutting a fast-rising and talented metal building broker from the industry. It is unenforceable as written.

> i.  *BBD Lacks Protectable Confidential Information*

71.     There is no confidential information at issue that constitutes a legitimate business interest.

72.     Information about manufacturers of metal buildings is publicly available and can be accessed through the internet.

73.     Many manufacturers—and brokers—host programs on their websites that allow individuals and competing brokers to view virtual renderings of metal buildings generated based on specific inputs, such as length, height, material, roof-type, and square footage.

74.     The identity of customers and manufacturers of metal buildings is neither confidential nor competition sensitive. The majority of customers reach out directly to building brokers from all over the country. To the extent customer leads are purchased, such leads are available to competitors. Similarly, given the nature of metal buildings, customer transactions are typically one-offs and customer lists fail to offer a competitive advantage, even if maintained.

75.     Allen was never privy to any confidential information, let alone confidential information that rises to the level of a legitimate business interest.

<em>ii.   BBD Lacks Protectable Relationships</em>

76.     There are no substantial, protectable customer or other relationships at issue.

77.     BBD's relationships are only protectable to the extent that such relationships are exclusive or near exclusive; long-term; cannot be easily identified or solicited by competitors; and there is a reasonable expectation of continued future business.

78.     BBD rarely—if ever—has an exclusive or near exclusive relationship with a customer or manufacturer.

79.     Customers and manufacturers are easily identifiable and are solicited by other competitors.

80.     BBD has no reasonable expectation of continued future business with customers.

### iii. BBD Did Not Supply Allen with Extraordinary Training

81.     Defendants did not supply Allen with training, let alone training that could be considered specialized or extraordinary.

### COUNT I
### VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (Allen against Defendants)

82.     Plaintiff Allen repeats and realleges Paragraphs 1-9, 13-17, 19-31, 34-37, and 43-46 as if fully set forth herein.

83.     Allen regularly worked for Defendants in excess of forty (40) hours a week.

84.     During her employment, Allen never qualified as an executive, administrative, or outside sales employee, or any other kind of employee exempt from overtime regulations under 29 C.F.R. Part 541 § 13. For example:

    a.   Allen's job duties included providing services from Defendants' business office.

    b.   Allen's job duties required her physical presence at Defendants' business office for the majority of her hours worked.

    c.   Allen was never compensated by Defendants on a salary basis at a rate equal to or in excess of $684 per week.

    d.   Allen never customarily and regularly directed the work of two or more other full-time employees or their equivalent.

85.     Allen's work for Defendants affected interstate commerce for the relevant time period because Defendants' clients and the manufacturers they utilize are located both in-state and out-of-state. Allen routinely engaged in negotiations with purchasers and suppliers across the United States.

86.     Defendants grossed in excess of $500,000 per annum for the relevant time period.

87.     At all times material, Defendants maintained control, oversight, and direction over Allen in her capacity as Defendants' employee, including, but not limited to, hiring and firing decisions, determining her rate of pay and work schedule, maintaining employment records, and otherwise controlling the terms and conditions of Plaintiff's employment.

88.     At all times material, Defendants had control over and power to change compensation practices that harmed Allen and other individuals Defendants employed.

89.     Defendants failed to make, keep, and preserve accurate records with respect to Allen's hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

90.     The FLSA, pursuant to 29 U.S.C. § 207, requires covered employers, such as Defendants, to compensate all non-exempt employees, such as Allen, at a rate not less than one-and-one-half times their regular rate of pay for work performed in excess of forty (40) hours per workweek.

91.     Defendants failed to pay Allen overtime wages for hours worked over forty (40) hours a workweek. As such, Alen is entitled to overtime compensation at one-and-one-half times her regular rate of pay for all work performed in excess of forty (40) hours per workweek.

92.     Defendants were aware or disregarded the possibility that its practices with regard to Allen's compensation violated the FLSA.

93.     Due to Defendants' intentional, willful, and unlawful acts, Allen was deprived of overtime compensation in amounts to be determined at trial, and she is entitled to recovery of these amounts, liquidated damages, and attorney's fees pursuant to the FLSA, each in an amount to be proven at trial.

**COUNT II**
**VIOLATIONS OF THE LANHAM ACT (15 U.S.C. § 1125(a))**
**(Platinum against Defendants)**

94.     Platinum repeats and realleges Paragraphs 1-5, 7, 8, 12-14, 16-17, and 19-65 as if fully set forth herein.

95.     Platinum competes and desires to continue competing against Defendants in the metal building brokerage market.

96.     Platinum has a commercial interest in its industry and business reputation within the metal buildings sales business.

97.     Platinum, a fledgling business, had already established a business reputation of honesty, reliability, and integrity in this industry.

98.     Defendants knowingly made false and misleading statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Platinum's commercial activities, services, and reputation.

99.     Defendants falsely and misleadingly represented to Platinum's clients and potential clients that Platinum, through Cunningham and otherwise, had defrauded its customers through falsely representing its affiliation with vendors, committed check fraud, and engaged in other illegal and reprehensible conduct.

100.    Defendants made such false and misleading representations verbally and in writing.

101.    Defendants' representations were sufficiently disseminated to former and potential clients throughout the relevant market so as to constitute advertising.

102.    Defendants made these representations in commerce and for commercial purposes. Specifically, Defendants made these representations to destroy Platinum's commercial reputation, to encourage clients to cancel existing deals with it, to prevent clients and potential clients from doing business with it, and to cut Platinum's burgeoning market presence off at the knees.

103.    Defendants' false and misleading representations have misled, confused, and deceived actual, former, and prospective Platinum clients. But the damage is not done. Defendants' misrepresentations have the capacity to continue misleading, confusing, and deceiving individuals and entities to which they were made and the metal building market at large.

104.   These misrepresentations had and continue to have a material effect on purchasers and manufacturers' willingness to do business with Platinum.

105.   Platinum's injuries fall squarely within the zone of interest protected by the Lanham Act because Defendants' false advertising and disparaging misrepresentations have caused Platinum to suffer a loss of goodwill, a loss of income, and damage to its industry and business reputation.

106.   Defendants' remarks were widely disseminated to Platinum's current, former, and prospective vendors (such as manufacturers of metal buildings), current and prospective purchasers, and others that Platinum does business with. Defendants' false and misleading remarks were sufficiently disseminated so as to constitute advertising or promotion within the metal building broker industry.

107.   Defendants made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

108.   Defendants directed its false advertisements and disparaging misrepresentations to current, former, and prospective clients and others throughout the industry to manipulate them into doing business with Defendants and not with Platinum.

109.   Platinum's economic and reputational injuries were directly caused by Defendants' false and misleading representations. As a direct and proximate result of Defendants' false advertisements, Platinum has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary damages and

for which Platinum lacks an adequate remedy at law. Platinum is entitled to corrective advertising.

110.   Additionally, as a result of Defendants' false and misleading representations, Platinum is entitled to actual consequential damages resulting from Defendants' conduct in an amount to be determined at trial.

**COUNT III**
**VIOLATIONS OF THE LANHAM ACT (15 U.S.C. § 1125(a))**
**(Cunningham against Defendants)**

111.   Cunningham repeats and realleges Paragraphs 1-5, 7, 8, 10, 13, 14, 17, 17, 19-33, 37-43, 46-52, 54-60, and 62-69 as if fully set forth herein.

112.   Cunningham competes and desires to continue competing against Defendants in the metal building brokerage market.

113.   Cunningham has a commercial interest in his industry and business reputation within the metal buildings sales business.

114.   Cunningham has a business reputation of honesty, reliability, and integrity in this industry.

115.   Defendants knowingly made false and misleading statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Cunningham's commercial activities, services, and reputation.

116.    Defendants falsely and misleadingly represented to Cunningham's clients and potential clients that he, on behalf of Platinum and otherwise, had defrauded customers through falsely representing his affiliation with vendors, committed check fraud, and engaged in other illegal and reprehensible conduct.

117.    Similarly, Defendants falsely and misleadingly represented to Cunningham's actual and prospective vendors (e.g., manufacturers of metal buildings) that he, on behalf of Platinum and otherwise, had defrauded customers and manufacturers, committed check fraud, stole from BBD, and engaged in other illegal and reprehensible conduct.

118.    Defendants made such false and misleading representations verbally and in writing.

119.    Defendants made these representations in commerce and for commercial purposes. Specifically, Defendants made these representations to destroy Cunningham's commercial reputation, to induce or prevent clients, potential clients, vendors, and potential vendors from doing business with him and to cut Cunningham out of the metal building brokerage market.

120.    Defendants' false and misleading representations have misled, confused, and deceived actual, former, and prospective clients and vendors. But the damage is not done. Defendants' misrepresentations have the capacity to continue misleading, confusing, and deceiving the individuals and entities to whom they were made as well as the metal building market at large.

121.   These misrepresentations had and continue to have a material effect on the willingness of clients, prospective clients, and vendors and prospective vendors to do business with Cunningham.

122.   Cunningham's injuries fall squarely within the zone of interest protected by the Lanham Act because Defendants' false advertising and disparaging misrepresentations have caused him to suffer a loss of goodwill, a loss of income, and damage to his industry and business reputation.

123.   Defendants' remarks were widely disseminated to Cunningham's current and prospective clients, current and prospective vendors, and others he does business with. These false and misleading remarks were sufficiently disseminated so as to constitute advertising or promotion within the metal building brokerage industry.

124.   Defendants made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

125.   Defendants directed its false advertisements and disparaging misrepresentations to current, former, and prospective clients and others throughout the industry to manipulate them into doing business with Defendants and not with Cunningham.

126.   Cunningham's economic and reputational injuries were directly caused by Defendants' false and misleading representations. As a direct and proximate result of Defendants' false advertisements, Cunningham has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary

damages and for which Cunningham lacks an adequate remedy at law. Cunningham is entitled to corrective advertising.

127. Additionally, as a result of Defendants' false and misleading representations, Cunningham is entitled to actual consequential damages resulting from Defendants' conduct in an amount to be determined at trial.

## COUNT IV
## VIOLATIONS OF THE LANHAM ACT (15 U.S.C. § 1125(a))
### (Allen against Defendants)

128. Allen repeats and realleges Paragraphs 1-9, 13, 14, 16, 17, 19-31, 37-46, 50-52, 54-60, and 62-69 as if fully set forth herein.

129. Allen desires to compete against Defendants in the metal building brokerage market.

130. Allen has a commercial interest in her industry and business reputation within the metal buildings sales business.

131. Allen has a business reputation of honesty, reliability, and integrity in this industry.

132. Defendants knowingly made false and misleading statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Allen's commercial activities, services, and reputation.

133. Defendants falsely and misleadingly represented to Allen's potential clients that she had defrauded customers through falsely representing her affiliation with vendors, committed check fraud, and engaged in other illegal and reprehensible conduct.

24

134.    Similarly, Defendants falsely and misleadingly represented to Allen's prospective vendors (e.g., manufacturers of metal buildings) that she defrauded customers and manufacturers, committed check fraud, stole from BBD, and engaged in other illegal and reprehensible conduct.

135.    Defendants made such false and misleading representations verbally and in writing.

136.    Defendants made these representations in commerce and for commercial purposes. Specifically, Defendants made these representations to destroy Allen's commercial reputation, to induce or prevent potential clients and potential vendors from doing business with her and prevent Allen's competition in the metal building brokerage market.

137.    Defendants' false and misleading representations have misled, confused, and deceived prospective clients and vendors. But the damage is not done. Defendants' misrepresentations have the capacity to continue misleading, confusing, and deceiving the individuals and entities to whom they were made as well as the metal building market at large.

138.    These misrepresentations had and continue to have a material effect on the willingness of prospective clients and prospective vendors to do business with Allen.

139.   Allen's injuries fall squarely within the zone of interest protected by the Lanham Act because Defendants' false advertising and disparaging misrepresentations have caused her to suffer a loss of goodwill, a loss of income, and damage to her industry and business reputation.

140.   Defendants' remarks were widely disseminated to Allen's prospective clients, prospective vendors, and others in the market.  These false and misleading remarks were sufficiently disseminated so as to constitute advertising or promotion within the metal building brokerage industry.

141.   Defendants made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

142.   Defendants directed its false advertisements and disparaging misrepresentations to prospective clients and others throughout the industry to manipulate them into doing business with Defendants and not with Allen.

143.   Allen's economic and reputational injuries were directly caused by Defendants' false and misleading representations. As a direct and proximate result of Defendants' false advertisements, Allen has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary damages and for which Allen lacks an adequate remedy at law. Allen is entitled to corrective advertising.

144.   Additionally, as a result of Defendants' false and misleading representations, Allen is entitled to actual consequential damages resulting from Defendants' conduct in an amount to be determined at trial.

**COUNT V**
**VIOLATIONS OF THE LANHAM ACT (15 U.S.C. § 1125(a))**
**(Mohamed against Defendants)**

145.   Mohamed repeats and realleges Paragraphs 1-5, 7, 8, 11, 13, 14, 17, 19-31, and 47-65 as if fully set forth herein.

146.   Mohamed competes and desires to continue competing against Defendants in the metal building brokerage market.

147.   Mohamed has a commercial interest in her industry and business reputation within the metal buildings sales business.

148.   Mohamed has a business reputation of honesty, reliability, and integrity in this industry.

149.   Defendants knowingly made false and misleading statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Mohamed commercial activities, services, and reputation.

150.   Defendants falsely and misleadingly represented to Mohamed's clients and potential clients that she, on behalf of Platinum and otherwise, had defrauded customers through falsely representing her affiliation with vendors, committed fraud, and engaged in other illegal and reprehensible conduct.

151.   Similarly, Defendants falsely and misleadingly represented to Mohamed's actual and prospective vendors (e.g., manufacturers of metal buildings) that she, on behalf of Platinum and otherwise, had defrauded customers and

manufacturers, committed check fraud, stole from BBD, and engaged in other illegal and reprehensible conduct.

152.   Defendants made such false and misleading representations verbally and in writing.

153.   Defendants' specifically targeted Mohamed by tagging her Facebook profile with their false and misleading statements.

154.   Defendants made these representations in commerce and for commercial purposes. Specifically, Defendants made these representations to destroy Mohamed's commercial reputation, to induce or prevent clients, potential clients, vendors, and potential vendors from doing business with her and to cut Mohamed out of the metal building broker market.

155.   Defendants' false and misleading representations have misled, confused, and deceived actual, former, and prospective clients and vendors. But the damage is not done. Defendants' misrepresentations have the capacity to continue misleading, confusing, and deceiving the individuals and entities to whom they were made as well as the metal building market at large.

156.   These misrepresentations had and continue to have a material effect on the willingness of clients, prospective clients, and vendors and prospective vendors to do business with Mohamed.

157.    Mohamed's injuries fall squarely within the zone of interest protected by the Lanham Act because Defendants' false advertising and disparaging misrepresentations have caused her to suffer a loss of goodwill, a loss of income, and damage to her industry and business reputation.

158.    Defendants' remarks were widely disseminated to Mohamed's current and prospective clients, current and prospective vendors, and others she does business with. These false and misleading remarks were sufficiently disseminated so as to constitute advertising or promotion within the metal building brokerage industry.

159.    Defendants made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

160.    Defendants directed its false advertisements and disparaging misrepresentations to current, former, and prospective clients and others throughout the industry to manipulate them into doing business with Defendants and not doing business with Mohamed.

161.    Mohamed's economic and reputational injuries were directly caused by Defendants' false and misleading representations. As a direct and proximate result of Defendants' false advertisements, Mohamed has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary damages and for which Mohamed lacks an adequate remedy at law. Mohamed is entitled to corrective advertising.

162.    Additionally, as a result of Defendants' false and misleading representations, Mohamed is entitled to actual consequential damages resulting from Defendants' conduct in an amount to be determined at trial.

**COUNT VI**
**DECLARATORY JUDGMENT THAT THE NON-COMPETE IS**
**UNEFORCEABLE UNDER FLA. STAT. § 542.335**
**(Allen against BBD)**

163.    Allen repeats and realleges the allegations in paragraphs 1-9, 13, 15, 16, 18, 19, 21-31, 34-46, 50-52, 54-56, and 65-81 as if fully set forth herein.

164.    BBD, through Panapinto and otherwise, maintains that Allen is subject to an enforceable Non-Compete.

165.    A dispute exists between BBD and Allen regarding the enforceability of the Non-Compete.

166.    There exists an actual controversy that flows from BBD's assertions, through Panapinto and otherwise, that Allen is bound by the Non-Compete such that her work and fair competition in metal buildings sales is prohibited.

167.    BBD and Allen's legal rights, powers, and duties depend upon a declaration by this Court.

168.    All Parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

169.    Neither the controversy nor the facts upon which it is based are hypothetical. BBD and Allen have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the enforceability

of the Non-Compete would immediately clarify their respective rights, powers, and duties.

170.   Allen has suffered and is threatened with further injuries because of BBD's representations, through Panapinto, and otherwise, that she is bound by the Non-Compete and that the Non-Compete prohibits her lawful competition with BBD.

171.   The Non-Compete constitutes an unlawful restraint of trade under Florida Statute § 542.335 because it is neither supported by nor necessary to protect any legitimate business interests. Specifically:

    a.   Allen did not receive any specialized or extraordinary training from Defendant BBD;

    b.   Allen did not have access to and was not exposed to any confidential business information that was unique to BBD and could be used to engage in unfair competition;

    c.   No customer relationships potentially at issue are substantial or protectable; and

    d.   There are no other legitimate business interests that could justify enforcement of the Non-Compete as written.

172.   The Non-Compete merely serves to prevent competition *per se*, rendering it violative of Florida Statute § 542.335 and unenforceable.

173.   BBD's willful and intentional violation of federal overtime law provides an entirely separate basis upon which to invalidate the Non-Compete agreement.

174.   Accordingly, Allen seeks a declaration that the Non-Compete is invalid and unenforceable as written.

## COUNT VII
## DEFAMATION *PER SE*
### (Allen against Defendants)

175.    Allen repeats and realleges Paragraphs 1-9, 13, 14, 18-31, 34-46, 50-52, and 54-69 as if fully set forth herein.

176.    Defendants made the following statements to Allen's former colleagues and clients and her subsequent employer, and her current employer that she:

a.  had engaged in credit card fraud totaling at least $100,000;

b.  had robbed BBD's office;

c.  had burglarized BBD's office;

d.  had engaged in business fraud;

e.  was being investigated by the police and the FBI;

f.  had been fired from BBD for theft;

g.  had at least "18 customers" whom had "filed charges" against her;

h.  was illegally competing with BBD through Platinum; and

i.  had faked a cancer diagnosis.

177.    Defendants' statements are defamatory *per se* because, even when considered alone, they tend to subject Allen to distrust, ridicule, contempt, and disgrace and are injurious to Allen's professional reputation. Further, considered alone, they impute to Allen criminal offenses and conduct and characteristics that are incompatible with the proper exercise of her lawful profession or office.

178.    These statements were aimed at harming Allen's fitness in her profession and her moral character.

32

179.   At the time these statements were made, Defendants knew or should have known that the statements would cause severe damage to her personal and professional reputation, her business opportunities, her career, and ultimately her ability to earn a living.

180.   Defendants made the foregoing statements with actual malice because they either knew of their falsity or made the statements with reckless disregard for their truth or falsity.

181.   Defendants knew that these statements were false when publishing them or, at minimum, had no reason to believe that they were true upon publication, thereby destroying any privilege on which Defendants could rely.

182.   In making the defamatory statements, Defendants acted intentionally, maliciously, willfully, and with the intent to injure Allen.

183.   Allen has been harmed by the diminished economic value of (1) the goodwill she built over her many years and (2) her reputation as an honest, ethical, reliable, hard-working individual, which she built over many years.

184.   Defendants' statements wrongfully paint Allen as unprofessional, untrustworthy, immoral, criminal, and unfit for employment in the relevant industry.

185.   Defendants' conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately to cause Allen severe harm, so as to justify the award of punitive and exemplary damages.

186.   As a result of Defendants' defamatory statements, Allen has been damaged in an amount to be determined at trial.

## COUNT VIII
## DEFAMATION *PER SE*
### (Cunningham as to Defendants)

187.   Cunningham repeats and realleges Paragraphs 1-5, 7, 8, 10, 13, 14, 18-33, 37-52, and 54-65 as if fully set forth herein.

188.   Defendants made the following statements to Cunningham's former colleagues, as well as current, former, and prospective clients and current and prospective vendors that he:

  a.  had engaged in credit card fraud;

  b.  had robbed BBD's office;

  c.  had burglarized BBD's office;

  d.  had engaged in business fraud;

  e.  was being investigated by the police and the FBI;

  f.  had been fired from BBD for theft;

  g.  was illegally competing with BBD through Platinum; and

  h.  misrepresented his affiliation with various vendors through his work with Platinum.

189.   Defendants' statements are defamatory *per se* because, even when considered alone, they tend to subject Cunningham to distrust, ridicule, contempt, and disgrace and are injurious to Cunningham's professional reputation. Further, considered alone, they impute to Cunningham criminal offenses and conduct and

characteristics that are incompatible with the proper exercise of his lawful profession or office.

190.    These statements were aimed at harming Cunningham's fitness in his profession and his moral character.

191.    At the time these statements were made, Defendants knew or should have known that the statements would cause severe damage to his personal and professional reputation, his business opportunities, his career, and ultimately his ability to earn a living.

192.    Defendants made the foregoing statements with actual malice because they either knew of their falsity or made the statements with reckless disregard for their truth or falsity.

193.    Defendants knew that these statements were false when publishing them or, at minimum, had no reason to believe that they were true upon publication, thereby destroying any privilege on which Defendants could rely.

194.    In making the defamatory statements, Defendants acted intentionally, maliciously, willfully, and with the intent to injure Cunningham.

195.    Cunningham has been harmed by the diminished economic value of (1) the goodwill he built over his many years and (2) his reputation as an honest, ethical, reliable, hard-working individual, which he built over many years.

196.    Defendants' statements wrongfully paint Cunningham as unprofessional, untrustworthy, immoral, criminal, and unfit for employment in the relevant industry.

197.    Defendants' conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately to cause Cunningham severe harm, so as to justify the award of punitive and exemplary damages.

198.    As a result of Defendants' defamatory statements, Cunningham has been damaged in an amount to be determined at trial.

**COUNT IX**
**DEFAMATION *PER SE***
**(Mohamed as to Defendants)**

199.    Mohamed repeats and realleges Paragraphs 1-5, 7,8, 11, 13, 14, 18-31, and 47-65 as if fully set forth herein.

200.    Defendants stated to Mohamed's colleagues, as well as current, former, and prospective clients and current and prospective vendors that she had engaged in 'business fraud' and was illegally competing with BBD through Platinum.

201.    Defendants intentionally circulated these falsehoods on Facebook (the town square of the twenty-first century) and intentionally tagged Mohamed's Facebook account so that individuals she is acquainted with online, including those she does business with, would see them.

202.    Defendants' statements are defamatory *per se* because, even when considered alone, they tend to subject Mohamed to distrust, ridicule, contempt, and disgrace and are injurious to Mohamed's professional reputation. Further, considered alone, they impute to Mohamed criminal offenses and conduct and characteristics that are incompatible with the proper exercise of her lawful profession or office.

36

203.    These statements were aimed at harming Mohamed's fitness in her profession and her moral character.

204.    At the time these statements were made, Defendants knew or should have known that the statements would cause severe damage to her personal and professional reputation, her business opportunities, her career, and ultimately her ability to earn a living.

205.    Defendants made the foregoing statements with actual malice because they either knew of their falsity or made the statements with reckless disregard for their truth or falsity.

206.    Defendants knew that these statements were false when publishing them or, at minimum, had no reason to believe that they were true upon publication, thereby destroying any privilege on which Defendants could rely.

207.    In making the defamatory statements, Defendants acted intentionally, maliciously, willfully, and with the intent to injure Mohamed.

208.    Mohamed has been harmed by the diminished economic value of (1) the goodwill she built over her many years and (2) her reputation as an honest, ethical, reliable, hard-working individual, which she built over many years.

209.    Defendants' statements wrongfully paint Mohamed as unprofessional, untrustworthy, immoral, criminal, and unfit for employment in the relevant industry.

210.    Defendants' conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and

deliberately to cause Mohamed severe harm, so as to justify the award of punitive and exemplary damages.

211.   As a result of Defendants' defamatory statements, Mohamed has been damaged in an amount to be determined at trial.

## COUNT X
## TORTIOUS INTERFERENCE
### (Allen as to Defendants)

212.   Allen repeats and realleges Paragraphs 1-9, 13, 14, 18-21, 34-46, 50-52, and 67-69 as if fully set forth herein.

213.   Allen had a business relationship with 100Insure, a Medicare billing entity located in St. Petersburg, Florida. It was her employer after she departed BBD.

214.   Defendants are and were aware of Allen's business relationship with this company.

215.   With that knowledge, Defendants intentionally and unjustifiably interfered with Allen's advantageous business relationships with her employer.

216.   Defendants interfered with Allen's business relationship by, at a minimum, falsely advising this entity that Allen was engaged in fraud. Specifically, Panapinto, individually and on behalf of BBD, called Allen's employer multiple times and falsely claimed that:

   a.   Allen had committed credit card fraud in excess of $100,000;

   b.   Allen was under investigation by the local police and FBI; and

   c.   that 100Insure was at risk of exposure due to its relationship with Allen

217.   Defendants' actions toward Allen's business relationship were made with malice. Their actions are intentional, unjustifiable, and not privileged.

218.   As a direct and proximate result of Defendants' tortious interference with Allen's relationship, Allen is no longer employed by 100Insure, and has suffered actual and consequential damages in an amount to be determined at trial.

## COUNT XI
## TORTIOUS INTERFERENCE
### (Platinum as to Defendants)

219.   Platinum repeats and realleges Paragraphs 1-5, 7, 9, 12-14, 18-31, and 46-63 as if fully set forth herein.

220.   Platinum has business relationships with both manufacturers and purchasers of metal buildings all over the country.

221.   Defendants are and were aware of Platinum's business relationships with these commercial establishments and individuals.

222.   With that knowledge, Defendants intentionally and unjustifiably interfered with and continue to intentionally and unjustifiably interfere with Platinum's advantageous business relationships.

223.   Defendants interfered with Platinum's relationships with clients all over the country, including, at a minimum, individuals named (1) Hajek, (2) Marteny, and (3) Schwartz.

224.   Each of these individual clients had agreed to do business with Platinum. They discontinued their business with Platinum as a result of Defendants' tortious interference.

225.    Defendants interfered with Platinum's relationships with manufacturers all over the country, including, at a minimum, with manufacturers (1) Infinity, (2) New Team, (3) Quality, and (4) UMB.

226.    Each of these manufacturers had agreed to do business with Platinum. They have discontinued various business with Platinum as a result of Defendants' tortious interference.

227.    Defendants accomplished this by, among other things, reaching out to these individuals and entities and falsely claiming that Platinum was engaged in fraudulent billing practices, was a criminal enterprise, and was not actually a legitimate metal building broker.

228.    Defendants' actions toward Platinum's business relationships were made with malice. They are intentional, unjustifiable, and not privileged.

229.    As a direct and proximate result of Defendants' tortious interference with Platinum's business relationships, Platinum has suffered actual and consequential damages in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request the following relief, including damages of not less than $10,000,000.00, as follows:

(1)   Damages to Platinum from Defendants to the fullest extent permitted under the Lanham Act;

(2)   Damages to Cunningham from Defendants to the fullest extent permitted under the Lanham Act;

(3)   Damages to Allen from Defendants to the fullest extent permitted under the Lanham Act;

(4)   Damages to Mohamed from Defendants to the fullest extent permitted under the Lanham Act;

(5)   Corrective advertising under the Lanham Act as to Defendants;

(6)   Actual and liquidated damages, in an amount to be determined, for Allen's unpaid wages as a result of Defendants' violations of the FLSA;

(7)   A declaratory judgment holding the Non-Compete, as written, is unlawful, void, and unenforceable pursuant to Florida Statutes § 542.335;

(8)   Alternatively, a declaratory judgment stating the reformed scope of the Non-Compete by which Allen remains bound or stating that Plaintiff is subject to no such restrictions;

(9)   Compensatory damages suffered by Allen, resulting from Defendants' defamation *per se*;

(10)  Presumed damages flowing from Defendants' defamation *per se* of Allen;

(11)  Punitive damages to punish Defendants' defamation *per se* of Allen;

(12)  Compensatory damages suffered by Cunningham, resulting from Defendants' defamation *per se*;

(13) Presumed damages flowing from Defendants' defamation *per se* of Cunningham;

(14) Punitive damages to punish Defendants' defamation *per se* of Cunningham;

(15) Compensatory damages suffered by Mohamed, resulting from Defendants' defamation *per se*;

(16) Presumed damages flowing from Defendants' defamation *per se* of Mohamed;

(17) Punitive damages to punish Defendants' defamation *per se* of Mohamed;

(18) Compensatory damages suffered by Allen as a result of Defendants' tortious interference;

(19) Punitive damages suffered by Allen as a result of Defendants' tortious interference;

(20) Compensatory damages suffered by Platinum as a result of Defendants' tortious interference

(21) Punitive damages suffered by Platinum as a result of Defendants' tortious interference;

(22) Pre-judgment and post-judgment interest;

(23) An award of attorneys' fees and costs of the action, including through 29 U.S.C. § 216, 15 U.S.C. § 1117(a), and Fla. Stat. § 542.335(1)(k) to the extent applicable; and

(24) Such other relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all claims.

Dated: August 24, 2021

Respectfully submitted,

By: */s/ Christopher S. Prater*
**CHRISTOPHER S. PRATER**
Florida Bar No.: 105488
cprater@pollardllc.com

**JONATHAN E. POLLARD**
Florida Bar No.: 83613
jpollard@pollardllc.com
Lead Counsel

**POLLARD PLLC**
100 SE 3rd Ave., Ste. 601
Fort Lauderdale, FL 33394
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiffs*